## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TIMOTHY FRASER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **20-11654-FDS** |
| **MASSACHUSETTS BAY TRANSPORTATION** ) | |
| **AUTHORITY, JAMES DAVIE, BRIAN HARER,** ) | |
| **WHITNEY BELL, and JEFFREY TAYLOR,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, C.J.**

This is a civil rights action arising out of an arrest.  Plaintiff Timothy Fraser was arrested by police officers after they received a complaint that he had sexually assaulted a woman at a bus station.  That complaint was false, and the charges against him were dropped before his arraignment the following day.

Fraser has sued the Massachusetts Bay Transportation Authority and the individual officers, asserting claims under 42 U.S.C. § 1983 and Massachusetts law.  The MBTA and the officers have moved to dismiss all claims for failure to state a claim upon which relief can be granted and on the basis of qualified immunity.

There is no question that Fraser suffered an unpleasant, if not traumatizing, experience. He was falsely accused of sexual assault, arrested, and spent several hours in jail.  He was cleared of suspicion within a day, once officers reviewed video footage of the area.  The

principal question here, however, is not whether the woman who falsely accused him should be held accountable, but whether the police officers who acted on her complaint, and the MBTA, should be subject to suit.

Under the circumstances, and for the reasons that follow, the officers are protected by the doctrine of qualified immunity as to Fraser's claims under § 1983 for false arrest and false imprisonment, and the complaint otherwise fails to state a federal claim. In light of the dismissal of all federal claims, the Court will decline to exercise supplemental jurisdiction over the state-law claims.

Accordingly, the motions to dismiss will be granted in part. The case will be remanded to Suffolk County Superior Court.

## I.    Background

### A.    Factual Background

The following facts are presented as alleged in the complaint unless otherwise noted.

Timothy Fraser is an attorney and an African-American man. (Compl. ¶ 1).

The Massachusetts Bay Transportation Authority ("MBTA") is a public agency that is responsible for operating public-transportation services in Massachusetts. (*Id.* ¶ 2). It operates a police department that has jurisdiction related to MBTA property and vehicles. (*Id.*). Whitney Bell, Jeffrey Taylor, Brian Harer, and James Davie are MBTA police officers. (*Id.* ¶¶ 3-6).

On August 1, 2017, Fraser left his office on Seaport Boulevard in Boston shortly before 6:00 p.m. (*Id.* ¶ 8). He went to Haymarket Station to board MBTA Bus #604 to Chelsea, where he lives. (*Id.* ¶ 9).

When he was on the crowded platform waiting to board the bus, a woman bumped into him. (*Id.* ¶¶ 10-11). She then falsely accused him of assaulting her. (*Id.*). The situation quickly escalated as she continued to accuse him of assault. (*Id.*).

2

In an attempt to defuse the situation, Fraser informed the bus driver that he would get off the bus so it could begin its route on schedule. (*Id.* ¶ 12).  The driver, who witnessed the altercation, agreed to pick him up at the next stop, which is a short walk from Haymarket Station. (*Id.* ¶ 14).  He walked to the intersection of North Washington Street and Thatcher Street, where he re-boarded the bus at approximately 6:10 p.m. (*Id.* ¶ 15).  After re-boarding, Fraser offered his contact information to the bus driver in the event that the MBTA needed to contact him concerning the incident. (*Id.* ¶ 16).

Sometime between 6:05 p.m. and 6:20 p.m., staff at Haymarket Station called 911 to report a disorderly person. (*Id.* ¶ 17).[1]  MBTA Officers Brian Harer and James Davie were dispatched to the station. (Compl. Ex. 2, at 1).  As they were on their way, they learned that "the incident was a[n] Indecent Assault and Battery, and the victim was keeping the suspect from leaving." (*Id.*).  When they arrived, the woman approached them and stated that she had been sexually assaulted. (*Id.*).  According to her, the suspect had "fled" the station and may have boarded another bus. (*Id.*).  She showed Harer and Davie a picture of Fraser that she had taken on her phone as he was leaving the station. (*Id.*).  Davie left Haymarket Station to search for Fraser. (*Id.*).

---

[1] The complaint alleges that the woman who accused Fraser of assault was the "disorderly person" who was the subject of the 911 call. (*See, e.g.*, Compl. ¶¶ 17, 34).  The resulting MBTA police report concerning the incident is unclear as to who was the "disorderly person." (*See* Compl. Ex. 2, at 1 ("Officer Davie and I . . . were dispatched to Haymarket MBTA Bus Station busway for a disorderly person.  While en route to the call[,] we were updated [that] the incident was a[n] Indecent Assault and Battery, and the victim was keeping the suspect from leaving.")).

That report is included as an exhibit to the complaint.  The Court may properly consider it without converting the pending motions into ones for summary judgment.  *See Branco v. Huard*, 2021 WL 916268, at *1 n.2 (D. Mass. Mar. 9, 2021) ("In considering the motion to dismiss, the Court also may consider documents attached to or fairly incorporated into the complaint . . . .") (citing *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *McIntyre v. United States*, 367 F.3d 38, 42 (1st Cir. 2004)).  As noted below, however, Fraser disputes the accuracy of certain portions of that report, and his claims are based in part on those alleged inaccuracies.

Harer asked the woman for further details about the incident. (*Id.*). She stated that Fraser had "rubbed his penis against her buttocks" and "when she confronted him[,] he smiled at her and then attempted to leave the station." (*Id.*). She described Fraser as "a brown male wearing a blue and white checkered shirt, tight black pants, with a short haircut and wearing glasses." (*Id.* at 1-2).

According to the complaint, the officers "knew or should have known" after their conversation with the woman that she was "an unreliable and incredible witness, a criminal known to the Commonwealth with currently pending assault charges against her." (Compl. ¶ 35).[2]

After receiving the additional details, Harer was picked up by Officers Whitney Bell and Jeffrey Taylor. (Compl. Ex. 2, at 1). At approximately 6:20 p.m., two MBTA police cruisers pulled over Bus #604. (Compl. ¶ 18).[3] When the bus was pulled over, Fraser assumed that the stop was related to the incident at Haymarket Station. (*Id.* ¶ 20). He "immediately disembarked" the bus to speak with the officers. (*Id.*).

The complaint alleges that "[i]mmediately upon seeing Attorney Fraser, a young African American male, without probable cause and without speaking with him at all other than asking his name, MBTA police immediately apprehended him, patted him down without reasonable suspicion that he was armed, restrained him tightly with handcuffs, and arrested [him]." (*Id.* ¶

---

[2] Fraser contends that the police report, which refers to the woman as "Known to Commonwealth" or "KTC," indicates that she was "already known to authorities due to some previous or pending criminal or court process." (Pl. Officer Opp. at 10). The officers and the MBTA, however, contend that it was done "pursuant to policy to protect her identity as an alleged victim of sexual assault." (Officers Mem. at 2 n.1; MBTA Mem. at 2 n.1).

[3] The complaint alleges that Harer and Davie arrived at Bus #604 first and that Bell and Taylor arrived "immediately afterward." (Compl. ¶¶ 18-19). The police report, however, states that Davie stopped Bus #604 by himself and that Harer, Bell, and Taylor arrived together afterward. (Compl. Ex. 2, at 2).

21).[4]  It further alleges that the officers arrested Fraser solely based on the woman's complaint,

"without further inquiry or discussion with [him], without any attempt for corroboration by any

of several witnesses—including MBTA bus driver and staff who were present at the time of the

incident—and without any scene investigation whatsoever."  (*Id.* ¶ 37; *see also id.* ¶¶ 26-29).

According to the complaint, after he was handcuffed, Fraser "demanded" to be placed

inside a police cruiser "in an attempt to protect his reputation from further harm from the public

exposure . . . ."  (*Id.* ¶ 25).[5]  Harer read Fraser his *Miranda* rights and brought him back to

Haymarket Station.  (*Id.* ¶ 30).

At Haymarket Station, according to the police report, Harer asked the woman for a more

detailed account of the incident, which she provided.  (Compl. Ex. 2, at 2).  Harer and Davie next

presented Fraser to her, who identified him "as the alleged offender and the subject of the

MBTA's 911 call."  (Compl. ¶¶ 33-34).  Davie then informed Fraser that he was being arrested

for indecent assault and battery.  (*Id.* ¶ 36).  Fraser was transported to the MBTA police station,

where he was administratively processed and jailed.  (*Id.* ¶ 38).

At the station, the officers inventoried Fraser's wallet.  (*Id.* ¶ 40).  They discovered his

Board of Bar Overseers card and realized that he was an attorney.  (*Id.*).  The complaint alleges

that, after that discovery, Davie "intentionally prepared and filed a falsified police report,

incorrectly describing the order of key events."  (*Id.* ¶ 41).  It further alleges that "[t]he true

sequence of events . . . are clearly recorded on the surveillance video for Bus #604 and the

---

[4] The police report states that when Fraser met the officers at the door of the bus, he was "informed he was being detained as part of an investigation."  (Compl. Ex. 2, at 2).  According to the complaint, however, "[n]o such statement was made by Defendant Officer Harer or any of the other Defendant MBTA Officers."  (Compl. ¶ 23).

[5] The police report again has a somewhat contradictory account concerning the sequence of events.  (*See* Compl. Ex. 2, at 2 ("Fraser asked if he could be placed in the cruiser.  Fraser was placed in handcuffs and placed in the marked Transit Police cruiser . . . .")).

MBTA's Haymarket Station video surveillance cameras." (*Id.* ¶ 42).

Fraser eventually posted bail and was notified that he would be arraigned the following morning. (*Id.* ¶ 43). He was released around 9:10 p.m. (*Id.* ¶ 44). That night, he attempted to use his professional relationships with individuals at state law-enforcement agencies to contact MBTA investigators. (*Id.* ¶ 45). He also secured an attorney. (*Id.* ¶ 46).

Early in the morning of August 2, MBTA investigators reviewed the Haymarket Station security-camera footage. (*Id.* ¶ 47). They informed Fraser that the incident did not occur as the woman stated and that they did not find evidence to support filing a criminal complaint. (*Id.* ¶ 48).

Fraser appeared for his arraignment the following morning, August 2. (*Id.* ¶ 49). Before his case was called, MBTA investigators informed the Suffolk County District Attorney's Office that the MBTA was declining to file a criminal complaint. (*Id.* ¶ 50). According to the complaint, the D.A.'s office refused to withdraw the complaint drafted by the MBTA officers. (*Id.* ¶ 51). It informed Fraser that he could plead "not guilty," and produce the exculpatory video evidence at a pretrial hearing. (*Id.* ¶ 52). Eventually, shortly before Fraser's arrangement was called, the D.A.'s office "received instructions to withdraw the complaint." (*Id.* ¶ 55).

Fraser returned to work the next day, August 3. (*Id.* ¶ 58). Following his company's policy, he informed a partner of the charge and the resolution of the incident. (*Id.* ¶ 59). He was sent home on personal leave. (*Id.* ¶ 60).

That afternoon, Fraser went to the Emergency Room at Massachusetts General Hospital because he had been experiencing numbness in his arms and hands since he was released from jail. (*Id.* ¶¶ 61-62). He was diagnosed with "a pinched nerve due to compression for an extended period of time." (*Id.* ¶ 62; *see also* Compl. Ex. 3, at 1). He was instructed to take

600mg of ibuprofen every six hours and to follow-up with a neurologist if the numbness did not resolve within 48 hours.  (Compl. Ex. 3, at 1).

The following week, on August 8, Fraser returned to work.  (Compl. ¶ 63).  That day, he was fired.  (*Id.*).

### B.    Procedural Background

On July 17, 2020, Fraser sued the MBTA as well as Officers Davie, Harer, Bell, and Taylor in Suffolk County Superior Court.  The complaint asserts twelve causes of action:  (1) violation of civil rights – false arrest, (2) violation of civil rights – false imprisonment, (3) assault and battery and personal injury, (4) discrimination in violation of Mass. Gen. Laws ch. 151B, (5) violation of civil rights – abuse of process, (6) malicious prosecution, (7) negligent supervision and training, (8) official misconduct and due process violations – falsifying a police report, (9) defamation, (10) tortious interference with business relations, (11) intentional infliction of emotional distress, and (12) negligent infliction of emotional distress.[6]

Defendants removed the case to this District on September 4, 2020.  Davie, Harer, Bell, and Taylor have moved to dismiss all eleven counts against them, and the MBTA has moved to dismiss all four counts against it.

## II.    Legal Standard

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

---

[6] The complaint asserts various prayers for relief as a thirteenth cause of action.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When

determining whether a complaint satisfies that standard, a court must assume the truth of all well-

pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally*

*Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75,

77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual

allegations, either direct or inferential, respecting each material element necessary to sustain

recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir.

2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir.

2005)).

## III.   Analysis

### A.   Federal Claims

#### 1.   Claims Against Individual Officers

##### a.   Count 1:  Violation of Civil Rights – False Arrest and Count 2: Violation of Civil Rights – False Imprisonment

The complaint asserts two claims based on alleged violations of plaintiff's civil rights:

one for false arrest (Count 1) and one for false imprisonment (Count 2).  It is unclear from the

face of the complaint, however, whether those claims are § 1983 claims for deprivation of

plaintiff's constitutional rights under the Fourth and Fourteenth Amendments or state-law claims

for false arrest and false imprisonment.  Removal was based in part on the assumption that they

are § 1983 claims.  Defendants make the same assumption, which plaintiff does not dispute, in

their motions to dismiss.  The Court will therefore consider Count 1 and Count 2 to allege claims

under § 1983 rather than state law.

The First Circuit has indicated that claims under § 1983 for false arrest are a "subset" of

claims under § 1983 for false imprisonment.  *See Peña-Borrero v. Estremeda*, 365 F.3d 7, 13 n.8

(1st Cir. 2004).  As a result, when a complaint asserts distinct claims under § 1983 for false arrest and false imprisonment, it is "most appropriate to view the allegations as stating a single claim for violation of [plaintiff's] Fourth Amendment right to be free from an unreasonable seizure." *Id.* (citing *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998)).

Section 1983 provides a private cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983.  To maintain a cause of action under § 1983, a plaintiff must allege "deprivation of a federally secured right."  *Harrington v. City of Nashua*, 610 F.3d 24, 28 (1st Cir. 2010).  It is a "long settled principle" that the Fourth Amendment prohibits warrantless arrests not supported by probable cause.  *Prall v. City of Boston*, 985 F. Supp. 2d 115, 122 (D. Mass 2013) (citing *Bailey v. United States*, 568 U.S. 186, 192 (2013)).  To state a claim under § 1983 for false arrest, the complaint must therefore allege that the officers lacked probable cause to believe that plaintiff committed a crime.  *See Jordan v. Town of Waldoboro*, 943 F.3d 532, 545 (1st Cir. 2019) (citing *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009)).

### i.    Probable Cause Generally

"[P]robable cause to perform a warrantless arrest turns on 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense.'"  *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (second alteration in original).  Here, the officers contend that there was probable cause to arrest plaintiff for indecent

assault and battery based on the woman's allegations.[7]

It is well-established that "police officers can justifiably rely upon the credible complaint by a victim to support a finding of probable cause." *Forest v. Pawtucket Police Dep't*, 377 F.3d 52, 57 (1st Cir. 2004) (citing *B.C.R. Transp. Co. v. Fontaine*, 727 F.2d 7, 10 (1st Cir. 1984)). Such complaints are "generally considered to be reliable." *B.C.R. Transp.*, 727 F.2d at 10. Indeed, the First Circuit has stated that a victim's complaint by itself may establish probable cause under normal circumstances:

> Victims' complaints are a prime source of investigatory information for police officers. In the absence of circumstances that would raise a reasonably prudent officer's antennae, there is no requirement that the officer corroborate every aspect of every complaint with extrinsic information. The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause.

*Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004) (citing *Forest*, 377 F.3d at 57; *B.C.R. Transp.*, 727 F.2d at 10); *see also White v. Town of Marblehead*, 989 F. Supp. 345, 349-50 (D. Mass. 1997) (stating that where the officers arrested the plaintiff based only on the victim's complaint, "[c]redible words describing a coherent and dangerous narrative are enough to establish probable cause," and rejecting the plaintiff's argument that the officers should have made credibility determinations based on the appearance and status of the parties).

It is also well-established that officers do not have an "unflagging duty . . . to investigate fully before making a probable cause determination." *Acosta*, 386 F.3d at 10. They "normally" may end their investigation when they accumulate "facts that demonstrate sufficient probable cause." *Id.*

---

[7] Under Massachusetts law, indecent assault and battery is "an intentional, unprivileged, and indecent touching of the victim." *Commonwealth v. Kennedy*, 478 Mass. 804, 810 (2018) (quoting *Commonwealth v. Marzilli*, 457 Mass. 64, 67 (2010)).

In *B.C.R. Transport Co. v. Fontaine*, 727 F.2d 7 (1st Cir. 1984), however, the First Circuit recognized that probable cause does not automatically exist simply because police act on information provided by an alleged victim of a crime. "[W]hether or not probable cause exists in any given case invariably depends on the particular facts and circumstances of that case, a question to be resolved by the trier of fact." *See id.* at 10. In that case, the evidence at trial showed that the alleged victim was a "drifter" who acted "incoherently while in police custody." *Id.* Based on that evidence, the court concluded that the jury could have found that the police acted without probable cause, even though they acted on information provided by the alleged victim. *See id.*[8]

The court came to a similar conclusion in *Lewis v. Kendrick*, 944 F.2d 949 (1st Cir. 1991). There, the alleged victim stated to police that her neighbor had threatened her with a knife. *See id.* at 952. After hearing the victim's complaint, the officers "immediately" arrested the neighbor without questioning anyone else at the scene, including the neighbor, and without searching for the knife. *Id.* The court concluded that based on those facts, "particularly that the police saw no knife, and looked for none, a jury could find that to accept a hitherto unknown alleged victim's uncorroborated account without question, where there was ample opportunity to question it, was a circumstance that weighed against probable cause." *Id.* (citing *B.C.R. Transp.*, 727 F.2d at 9-10).

Here, the Court will assume, without deciding, that the facts alleged in the complaint fall within the exception to the ordinary rule, and that therefore probable cause was lacking. The

---

[8] The First Circuit has since described its decision in *B.C.R. Transport* as "the exception, not the rule" to the extent that it held that the issue of probable cause was for the jury to decide. *See Acosta*, 386 F.3d at 8-9. "Though only a jury can resolve reasonably disputed issues of fact, whether a given set of facts constitutes probable cause is a legal question." *Jordan*, 943 F.3d at 541-42.

Court will therefore turn to the issue of qualified immunity.

### ii. Qualified Immunity

The officers contend that they are protected by the doctrine of qualified immunity. Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is determined according to a two-part test. *See Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009). The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *See id.*

Here, as discussed above, the complaint alleges that the officers violated plaintiff's Fourth Amendment right to be free from warrantless arrest without probable cause. Specifically, it alleges that the officers should have known that the woman, either based on her conduct at Haymarket Station or her history with the Commonwealth, was an "unreliable and incredible" witness. (Compl. ¶ 35). It further alleges that the officers failed to speak with any potential witnesses, including those from the MBTA, before arresting plaintiff. (*Id.* ¶ 37). Again, and for present purposes, the Court will assume that those allegations make out a violation of a constitutional right.

The second inquiry is whether that right was "clearly established." *See Jordan*, 943 F.3d at 548 ("We have already concluded that the officers violated a federal constitutional right, so the sole question is whether the unlawfulness of their conduct was clearly established at the time." (internal quotation marks omitted)); *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) ("[W]e already have decided that a jury could find that Cummings violated Gray's Fourth Amendment rights. We must now determine whether the alleged right was clearly established at the time of

Cummings's violation.").

The "clearly established" inquiry itself has two parts.  Courts must consider "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011).  That test does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Precedents involving "similar facts" help "provide an officer notice" that certain conduct is unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

Of course, "[t]here is little question that it is clearly established law that an individual cannot be arrested absent probable cause." *Fernández-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 326 (1st Cir. 2015) (citing *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (per curiam); *United States v. Mercedes-De La Cruz*, 787 F.3d 61, 68-69 (1st Cir. 2015)).  But the relevant question is not whether some right has been clearly established at a highly abstract level, but "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Burke v. Town of Walpol*e, 405 F.3d 66, 77 (1st Cir. 2005) (quoting *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004)); *see also Iacobucci v. Boutler*, 193 F.3d 14, 21-22 (1st Cir. 1999) ("[Plaintiff] observes that a citizen's right to be free from arrest in the absence of probable cause has long been clearly established. That observation sweeps so broadly, however, that it bears very little relationship to the objective legal reasonableness *vel non* of [the officer's] harm-inducing conduct.  The right the official is alleged to have violated must have been clearly established in a more particularized, and hence

13

more relevant, sense." (internal citations and quotation marks omitted)).

In the context of this case, the question is whether a reasonable officer would have known that he could not make a probable-cause determination based solely on the evidence of the alleged victim, who is alleged to have been an unreliable source. As noted, the case law indicates that an alleged victim's complaint alone may ordinarily support a finding of probable cause "[i]n the absence of circumstances that would raise a reasonably prudent officer's antennae." *Acosta*, 386 F.3d at 10; *see also Forest*, 377 F.3d at 57 ("[P]olice officers can justifiably rely upon the credible complaint by a victim to support a finding of probable cause."). It also indicates that when there are indicia of unreliability, further investigation to corroborate an alleged victim's complaint may be necessary to find probable cause. *See, e.g.*, *Lewis*, 944 F.2d at 952; *B.C.R. Transp.*, 727 F.2d at 9-10. It was therefore clearly established by the time of plaintiff's arrest that a reasonable officer could make an arrest based on a finding of probable cause that in turn was based only on an alleged victim's complaint, as long as there were not other circumstances that would "raise a reasonably prudent officer's antennae." *Acosta*, 386 F.3d at 10.

The qualified-immunity doctrine does not demand perfection; it permits a degree of latitude to make mistakes or misjudgments. Thus, where "a section 1983 action rests on a claim of false arrest, the qualified immunity standard is satisfied 'so long as the presence of probable cause is at least arguable.'" *Moses v. Mele*, 711 F.3d 213, 216 (1st Cir. 2013) (quoting *Ricci v. Urso*, 974 F.2d 5, 6-7 (1st Cir. 1992)); *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004) ("In the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.").

Here, plaintiff contends that probable cause is not "arguable" or "subject to legitimate

14

question" because the officers were aware that the woman was an unreliable witness, and because they did not conduct a further investigation before making the arrest.

The complaint alleges in general and conclusory terms that the woman who made the complaint was not credible.  (*See, e.g.*, Compl. ¶ 35).  The only specific allegations in support of that claim are that she was reported in the 911 call to be "disorderly" (which, according to defendants, is incorrect); that she was identified in the police report as someone "known to Commonwealth" (which, according to defendants, is a standard practice for alleged victims of sexual assault); and that she had "pending assault charges against her."  (*Id.* ¶¶ 17, 34-35).  The complaint does not allege, other than in a conclusory manner, that any individual officer actually knew anything about her, or the charges pending against her.  Nor was it obvious, even accepting the allegations of the complaint as true, that she was not credible, or that there were serious questions concerning her credibility.  She described an assault by an individual who then got on the bus, and gave a description of that individual; plaintiff, in fact, matched the description and was on the bus in question.  Nothing about those circumstances would have caused a reasonably prudent officer to conclude that she was fabricating the accusation.

It is true that the officers did not attempt to interview any potential witnesses, and the video was not retrieved until later that night.  It may well have been prudent or good practice to do so.  But the officers were not legally obligated at that stage to pursue every investigative avenue.  *See Acosta*, 386 F.3d at 11 ("[W]e . . . have disclaimed any unflagging duty on the part of law enforcement officers to investigate fully before making a probable cause determination. . . .  [A]n officer normally may terminate her investigation when she accumulates facts that demonstrate sufficient probable cause." (internal citations omitted)).  Moreover, the complaint does not allege, and there is no reason to believe, that the video footage was

immediately accessible to them, in their patrol cars or otherwise, at the moment the arrest decision was made.

It is also noteworthy that this incident was perhaps more fraught with complexity than a typical arrest.  Arguably, the officers should have been more skeptical of the report of an alleged victim of sexual assault, and demanded additional proof.  But law enforcement has been under substantial criticism—often justified—for not sufficiently crediting the complaints of such victims.  As a result of giving her testimony credence, they made an arrest.  Unfortunately, they arrested a man who was shown relatively quickly to be innocent.  And law enforcement has also been under substantial criticism—again, often justified—for unduly aggressive enforcement actions against minority populations.  That does not, of course, mean that these officers made the correct decision—obviously, they did not—but it helps to underscore the difficult nature of the decisions such officers are routinely required to make.

In any event, it is not necessary to find that the officers got it right.  One of the purposes of qualified immunity is to provide a reasonable degree of protection for officers to make certain kinds of mistakes.  The question, therefore, is not whether they might have made a better choice.  Rather, it is whether their actions were not even "arguabl[y]" supported by probable cause.  Under that standard, they are clearly protected by qualified immunity.

Accordingly, the Court will grant the officers' motion to dismiss Counts 1 and 2 on the basis of qualified immunity.

        **b.**        <u>**Count 5:  Violation of Civil Rights – Abuse of Process**</u>

Count 5 alleges a claim for abuse of process.  It is again unclear from the complaint whether it is a § 1983 claim or a claim under Massachusetts law.  The officers contend that the First Circuit does not recognize § 1983 claims based on an alleged abuse of process and that the complaint does not adequately allege a claim for abuse of process under Massachusetts law.  In

his opposition, plaintiff appears to accept that the First Circuit does not recognize such claims under § 1983 but contends that the complaint states a viable claim under state law.

Accordingly, to the extent that Count 5 alleges a claim under § 1983, it will be dismissed. To the extent that it alleges a claim under Massachusetts law, it will remain pending after remand to state court.

### c.  Count 8:  Official Misconduct and Violation of Due Process – Falsifying a Police Report

Count 8 alleges a claim against Officer Davie for falsifying a police report.  It is called "Official Misconduct & Due Process Violations; Falsifying a Police Report."  The legal basis for the claim is unclear.  The complaint alleges in general terms that Officer Davie violated plaintiff's due-process rights by filing a police report with a false narrative of events, and cites to a First Circuit case that considered claims under *Bivens* and § 1983.  It also alleges that Officer Davie committed "official misconduct" by filing that police report.  The officers assume it is a claim under § 1983.  In his opposition, plaintiff contends that Count 8 alleges a claim under § 1983, and even if it does not, it alleges a claim for "Official Misconduct" that is "clearly recognized under Massachusetts law."  (Pl. Opp. at 24).

The Court will therefore consider Count 8 to the extent that it alleges a claim under § 1983.  The officers contend that plaintiff is barred from bringing a due-process claim—either substantive or procedural—under § 1983 because Massachusetts recognizes the common-law torts of false arrest and malicious prosecution.  But the First Circuit has expressly stated that filing a false police report may underlie a claim under § 1983 when "action is subsequently taken on the basis of that report."  *Landrigan v. City of Warwick*, 628 F.2d 736, 745 (1st Cir. 1980).  As with all § 1983 claims, however, that subsequent action must deprive the plaintiff of a federally secured right to make out a viable claim.  *See id.* at 744-45 ("If action is subsequently

17

taken on the basis of that report, or if the report is disseminated in some manner, plaintiff's constitutional rights may well then be violated, and in that event a § 1983 action may lie." (internal citation omitted)); *id.* at 741 ("The first inquiry in any § 1983 suit is whether the plaintiff has been deprived of a right secured by the Constitution and laws." (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979)) (internal quotation marks and alterations omitted)).

Here, the complaint does not allege that plaintiff was deprived of any federally secured right—such as unlawful seizure in violation of the Fourth and Fourteenth Amendments—as a result of the alleged inaccuracies of the police report.  According to the complaint, plaintiff was arrested and jailed before that report was even drafted.  (*See* Compl. ¶¶ 24, 37-41).  Thus, even assuming that the officers drafted a partially false report—for example, to support finding probable cause or to minimize any misconduct on their behalf—those falsities did not result in the unlawful seizure or imprisonment of plaintiff or otherwise violate his federal rights.  The allegedly false report did not ultimately lead to any charges against plaintiff, and "the mere filing of the false police report[]," by itself, does not create a cause of action under § 1983.  *See Landrigan*, 628 F.2d at 745.

Accordingly, to the extent that Count 8 alleges a claim under § 1983, it will be dismissed.[9]  To the extent that it alleges a claim under Massachusetts law, it will remain pending after remand to state court.

### d. **Count 9:  Defamation**

Count 9 alleges a claim for defamation against Officer Davie based on the allegedly false police report.  It is again unclear whether the complaint asserts a state-law claim or a claim under

---

[9] Count 8 alleges a claim only against Officer Davie.  The report, however, was drafted and signed by Officer Harer.  Plaintiff requests that the Court grant him leave to amend the complaint to bring Count 8 against all four officers.  (*See* Pl. Officers Opp. at 25 n.4).  Because any such amendment would be futile for the reasons stated above, the Court will deny that request.

18

§ 1983.  Defamation is, of course, typically a state-law claim.  And the complaint relies on a decision from this District that considered a defamation claim under Massachusetts law based in part on an allegedly false police report.  (*See* Compl. ¶ 325 (citing *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 241 (D. Mass. 2016))).  The officers therefore assume that the claim is brought under Massachusetts law.

In his opposition memorandum, however, plaintiff contends that "the First Circuit . . . has stated, for a civil rights action for defamation to be actionable under § 1983, 'the stigmatizing statements must have been made in conjunction with an alteration of legal status, such as the termination of employment.'"  (Pl. Officer Opp. at 26 (quoting *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002))).  Furthermore, his opposition fails to include any argument as to why a state-law claim for defamation should survive.  It thus appears, based only on his opposition, that he is asserting a claim for defamation under § 1983.

The Court will consider Count 9 to the extent that it alleges a claim under § 1983.  As noted, in his opposition, plaintiff relies on the First Circuit's decision in *Wojcik*, which requires that any "stigmatizing statements must have been made in conjunction with an alteration" of legal status, "such as the termination of . . . employment."  300 F.3d at 103.  He then contends that his claim should survive because he suffered a "change in his legal status"—namely, he was terminated—"[a]s a result of the Defendant MBTA Officers['] defamatory statements in the false report."  (Pl. Officer Opp. at 26).

Plaintiff, however, is cherry-picking favorable language from *Wojcik*, without addressing its actual holding.  In that decision, the First Circuit explained one situation in which a defamatory statement may underpin a § 1983 claim:

> It is beyond cavil that defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights.  However, an

> exception to this general rule exists where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge.  In such circumstances, the Constitution's due process protections require the employer to provide the employee with an opportunity to dispute the defamatory allegations.  The employer's failure to provide an adequate name-clearing forum is actionable under § 1983.

*Wojcik*, 300 F.3d at 102-03 (internal quotation marks and citations omitted).  The Court then delineated five elements—one of which plaintiff extracts for his use—that a defamed public-sector employee must satisfy to establish a claim for deprivation of a liberty interest without due process:

> First, the alleged statements must level a charge against the employee that might seriously damage his standing and associations in his community and place his good name, reputation, honor, or integrity at stake. . . .  Second, the employee must dispute the charges made against him as false.  Third, the stigmatizing statements or charges must have been intentionally publicized by the government. . . .  Fourth, *the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment.*  Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

*Id.* at 103 (internal quotation marks, alterations, and citations omitted; emphasis added).

The rule of *Wojcik* plainly does not apply here.  It is possible that, construed generously, the complaint and opposition may allege a "stigma plus" claim, even though that term does not appear in either filing.  The First Circuit has explained that "a deprivation of a constitutionally protected liberty interest [occurs] when, in addition to mere reputational injury, words spoken by a government actor adversely impact a right or status previously enjoyed under state law."  *Pendleton v. City of Haverhill*, 156 F.3d 57, 67 (1st Cir. 1998).  "Stigma plus" claims are therefore exceptions to the general rule that defamation, even by government officials, does not itself violate constitutional rights.  To state such a claim, the complaint must allege "an adverse effect on some interest more tangible than reputational harm."  *Mead v. Independence Ass'n*, 684 F.3d 226, 233 (1st Cir. 2012) (quoting *URI Student Senate v. Town of Narragansett*, 631 F.3d 1,

10 (1st Cir. 2011)).

Plaintiff's claim, however, falls outside the "stigma plus" rubric.  First, "to achieve a sufficient 'plus' in a loss-of-job context, words spoken must be 'uttered incident to the termination.'"  *Pendleton*, 156 F.3d at 67 (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)).  Here, the alleged defamation and the decision to terminate plaintiff came from "two separate, unrelated sources, and the former cannot plausibly be said to have occurred 'incident to' the latter."  *Id.*; *see also Mead*, 684 F.3d at 233.

Second, "a violation of constitutional proportions under a 'stigma plus' theory exists only if, and to the extent that, the opportunities lost are government benefices denied as a result of governmental action."  *Pendleton*, 156 F.3d at 67.  Here, plaintiff worked for a private employer; he therefore did not lose government benefits when he was terminated.  *See id.*; *see also Mead*, 684 F.3d at 234 ("[T]he 'plus' in this case cannot be the loss of Mead's IA job with a private employer. . . .  Although it is regulated by, and receives funding from, DHHS, IA is a private employer. . . .  As such, Mead's job there was not a government benefice."); *Veale v. Keene Publishing Corp.*, 1999 WL 525941, at *1 (1st Cir. May 11, 1999) (per curiam) (unpublished) (stating that plaintiff could not allege a "stigma plus" claim where he worked "in business for himself as a landscaper and logger so [he could not] allege that he lost a government job as a result of the alleged defamatory statement").

Accordingly, to the extent that Count 9 alleges a claim under § 1983, it will be dismissed.[10]  To the extent that it alleges a claim under Massachusetts law, it will remain pending after remand to state court.

---

[10] Plaintiff again requests that the Court grant him leave to amend the complaint to bring Count 9 against all four officers.  (*See* Pl. Officers Opp. at 27).  As with Count 8, any such amendment would be futile for the reasons stated above.  The Court will therefore deny that request.

2.      **Claims Against MBTA**

a.      **Count 2:  Violation of Civil Rights – False Imprisonment**

Count 2 alleges a claim for false imprisonment under § 1983.[11]  The Supreme Court has

held that a state is not a "person" against whom a § 1983 claim for money damages may be

asserted.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989).  The MBTA, as a

state agency, therefore may not be sued under § 1983.  *See Powell v. Massachusetts Bay Trans.

Auth.*, 2020 WL 708536, at *2 (D. Mass. Feb. 12, 2020) (holding that the MBTA may not be

sued under § 1983).

Plaintiff nonetheless contends that the MBTA may be sued under § 1983 because the

state has waived sovereign immunity under the Massachusetts Tort Claims Act.  That contention,

however, is incorrect.  The Supreme Court's decision in *Lapides v. Board of Regents of

University System of Georgia*, 535 U.S. 613 (2002), is instructive.  In that case, the plaintiff

brought claims in state court under the Georgia Tort Claims Act and under § 1983.  *See id.* at

616.  A Georgia statute waived sovereign immunity from state-law suits in state court.  *See id.*

After removing the case to federal court, Georgia contended that it was immune from suit there

under the Eleventh Amendment to the United States Constitution.  *See id.*  The Court rejected

that argument.  It held that Georgia waived Eleventh Amendment immunity by removing the

case to federal court.  *See id.* at 624.  Even so, it further held that the plaintiff's claim under

§ 1983 nonetheless failed because Georgia was not a "person" against whom a § 1983 claim may

be asserted.  *See id.* at 617.

The present case offers an analogous situation.  Here, plaintiff sued the MBTA in state

---

[11] As noted, it is unclear from the complaint whether Count 2 is a § 1983 claim for deprivation of plaintiff's constitutional rights or a state-law claim for false imprisonment.  For the reasons discussed above, the Court will consider Count 2 to allege a claim under § 1983.

court and asserted against it claims under the MTCA and under § 1983.  With the MBTA's consent, the case was removed to federal court.  Even if the MTCA waives sovereign immunity in state court and the MBTA's removal of the case waives sovereign immunity in federal court, the state still cannot be liable under § 1983 because it is not a "person" within the meaning of the statute.  *See Lapides*, 525 U.S. at 617.  That is a matter of statutory, not constitutional, interpretation.  *See Will*, 491 U.S. at 66-67 (noting that the scope of the Eleventh Amendment and the scope of § 1983 are "separate issues" even if the former is a "consideration" when determining the latter).

The MBTA contends that it is also not liable under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), because the complaint does not plausibly allege that the alleged constitutional deprivation—here, plaintiff's unlawful seizure in violation of the Fourth Amendment—resulted from a governmental policy or practice.  But *Monell* does not apply for a far simpler reason:  it applies to municipalities, not states.  *See Will*, 491 U.S. at 70 ("[W]e consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes.'" (quoting *Monell*, 436 U.S. at 690 n.54)); *Disessa v. Massachusetts*, 2020 WL 1158254, at *3 (D. Mass. Mar. 10, 2020) ("*Monell* . . . does not extend to states.") (citing *Quern v. Jordan*, 440 U.S. 332, 338-39 (1979)).  As a result, even if the complaint plausibly alleged that an MBTA policy or practice caused plaintiff's allegedly unconstitutional seizure, the MBTA, as a state agency, could not be liable under *Monell*.

Accordingly, the Court will grant the motion of the MBTA to dismiss Count 2.

### B.     State-Law Claims

In light of the dismissal of the federal claims, the Court will decline to exercise supplemental jurisdiction over the state-law claims.  A district court's original jurisdiction extends, among other things, to claims that arise "under the Constitution, laws, or treaties of the

23

United States."  28 U.S.C. § 1331.  If an action includes both federal-law claims and state-law claims, then a district court may exercise supplemental jurisdiction over the state-law claims under some circumstances.  *See* 28 U.S.C. § 1367(a).  However, where a complaint fails to state a viable claim under federal law and jurisdiction over the remaining claims is based solely on supplemental jurisdiction, a "district court has discretion to decline to exercise supplemental jurisdiction."  *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); *see* 28 U.S.C. § 1367(c).  When deciding whether to exercise that discretion, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (noting that "it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts").

Here, the federal claims have been dismissed.  All that remain are state-law claims.[12]

_____

[12] As noted, it is unclear whether Count 5 (Violation of Civil Rights – Abuse of Process), Count 8 (Official Misconduct and Due Process Violations – Falsifying a Police Report), and Count 9 (Defamation) assert claims under federal or state law.  To the extent that they assert claims under state law, they will remain pending against the officers.

Furthermore, in his opposition to the MBTA's motion to dismiss, plaintiff contends that Count 7 (Negligent Supervision and Training) and Count 12 (Negligent Infliction of Emotional Distress) assert claims under federal law.  But the complaint makes clear that those counts assert state-law claims.  As to Count 7, the complaint explicitly alleges that the MBTA is liable "under the Massachusetts Tort Claims Act (MTCA) for its negligence in failing to train and supervise the Defendant MBTA Officers."  (Compl. ¶ 272 (citing Mass. Gen. Laws ch. 258; *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 411 (D. Mass. 2011))).  And as to Count 12, plaintiff relies on cases that consider state-law claims—albeit for intentional infliction of emotional distress—when asserting the claim for negligent infliction of emotional distress.  (*See id.* ¶ 433 (citing *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 240 (D. Mass. 2016)); *id.* ¶ 438 (citing *Polay v. McMahon*, 468 Mass. 379, 386 (2014))).  Plaintiff may not rewrite his complaint through his opposition papers.  *See Driscoll v. Simsbury Assocs., Inc.*, 2018 WL 2139223, at *5 n.3 (D. Mass. May 9, 2018).  Because they assert state-law claims, they will remain pending against the MBTA.

The other claims that will remain pending—Count 3 (Assault and Battery), Count 4 (Discrimination – Mass. Gen. Laws ch. 151B), Count 6 (Malicious Prosecution), Count 10 (Tortious Interference with Business Relations), and Count 11 (Intentional Infliction of Emotional Distress)—undisputedly assert claims under state law.

Apart from the complaint and motions to dismiss, no substantial litigation has occurred.  Under the circumstances, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.  The case will therefore be remanded to the Superior Court.

## IV.    <u>**Conclusion**</u>

For the foregoing reasons, the Officers' Motion to Dismiss is GRANTED as to Counts 1 and 2.  It is further GRANTED as to Counts 5, 8, and 9 to the extent that they assert claims under federal law.  The MBTA's Motion to Dismiss is GRANTED as to Count 2.

The Court does not reach defendants' motions to dismiss as to Counts 3, 4, 6, 7, 10, 11, and 12, which will remain pending after remand.  It further does not reach defendants' motions to dismiss Counts 5, 8, and 9 to the extent that they assert claims under state law, which will remain pending to such an extent after remand.

The case is hereby REMANDED to Suffolk County Superior Court.


**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  June 16, 2021                              Chief Judge, United States District Court